# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 95 C 5033 | DATE | June 4, 2004 |
| CASE TITLE | | U.S. ex. rel. Brisbon v. Shelton | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Petition for a Writ of Habeas Corpus

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] . Enter Memorandum Opinion and Order. For the attached reasons, Brisbon's petition for a writ of habeas corpus is DENIED. This case is terminated and any pending motions are denied as moot.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUN 0 7 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 178 |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | | |
| JHC | courtroom deputy's initials | 2004 JUN -4 PM 8:41 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |
| | | FILED | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel., HENRY OMAR BRISBON, # A-01072, | ) ) ) | |
| Petitioner, | ) ) | No. 95 C 5033 |
| v. | ) ) | **DOCKETED** |
| SHELTON FRY, Warden, Tamms Correctional Center,[1] | ) ) ) ) | Judge William J. Hibbler  JUN 0 7 2004 |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Following a jury trial in the Circuit Court of Cook County, petitioner, Henry Omar Brisbon, was convicted of murder and sentenced to death. After his direct and post-conviction appeals failed, Brisbon petitioned this court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. On January 11, 2003, former Illinois Governor George Ryan commuted Brisbon's death sentence to natural life in prison without the possibility of parole. Before this court is Brisbon's second amended petition for a writ of *habeas corpus*. For the reasons below, the court denies Brisbon's *habeas corpus* petition in its entirety.

I. BACKGROUND

A. Procedural History

Following a jury trial in the Circuit Court of Will County, Illinois, Brisbon was convicted of the murder of Richard "Hippie" Morgan. At a separate sentencing hearing, the jury found Brisbon eligible

---

[1] Shelton Fry is currently th Warden at the Tamms Correctional Center and is thus the proper respondent in this *habeas* action. *See* Rule 2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254. This Court hereby substitutes Fry as the respondent. *See* Fed. R. Civ. P. 25(d)(1).

1

17?

for the death penalty. The jury also concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty, and the court sentenced Brisbon to death.

Brisbon appealed to the Illinois Supreme Court, which upheld Brisbon's conviction but reversed and remanded for a new sentencing hearing. *People v. Brisbon*, 478 N.E.2d 402 (1985) *(Brisbon I)*. After a new sentencing hearing, Brisbon was again sentenced to death, and the Illinois Supreme Court affirmed this decision. *People v. Brisbon*, 544 N.E.2d 297 (1989) *(Brisbon II)*. Brisbon then filed a post-conviction petition in the Circuit Court of Will County, Illinois. The Will County Circuit Court dismissed Brisbon's post-conviction petition and the Illinois Supreme Court affirmed the dismissal. *People v. Brisbon*, 647 N.E.2d 935 (1995) *(Brisbon III)*. On April 18, 1996, Brisbon filed a petition for writ of *habeas corpus* in this court. Following commutation of his death sentence, Brisbon filed a second amended petition on August 28, 2003.

B. Trial Testimony

The following facts, which Brisbon does not challenge, are drawn from the Illinois Supreme Court's ruling on Brisbon's direct and post-conviction appeals. 28 U.S.C. § 2254(e)(1); *Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2002) (unless a *habeas* petitioner provides clear and convincing evidence to the contrary, a determination of a factual issue by a state court is presumed correct for the purposes of *habeas* review). On October 19, 1978, prison guard Nobie Mercer was accompanying a new prisoner to his cell at Stateville Penitentiary. As they passed by Brisbon's cell, Brisbon asked Mercer to let him out to use the bathroom because his toilet was clogged. Mercer refused and proceeded to lock up the new prisoner. After finishing, Mercer again passed by Brisbon's cell. This time, Mercer decided to release Brisbon. When he did, Brisbon seized Mercer and held a homemade knife to his throat. Brisbon then ordered Mercer to release fellow-inmate, Herman Morgan, from a neighboring cell, and

Mercer complied. Brisbon then locked Mercer in Herman Morgan's cell and the two inmates departed.

Inmates Tyreed Green, Josie Baynes, and Luke Ward witnessed the following events, which transpired during Mercer's confinement. Brisbon and Herman Morgan began walking the cell block looking for the victim, inmate Richard "Hippie" Morgan. Along the way, the pair met another inmate, Donald Binford, who joined in the search. The three inmates found Hippie Morgan standing in front of a cell, conversing with another prisoner. Binford and Herman Morgan grabbed Hippie Morgan and Brisbon stuck a homemade knife into his upper back. Hippie Morgan struggled to break free, but Brisbon stabbed him again. He finally freed himself and ran erratically down the corridor. The three men quickly overtook the victim, kicked him, and then ran upstairs. Hippie Morgan died shortly thereafter.

As Brisbon, Binford, and Herman Morgan fled upstairs, they passed inmate Josie Baynes. Brisbon said to Baynes: "I tried to kill that [obscenity]." Brisbon then released Mercer from the cell, and Mercer locked Herman Morgan and Brisbon into their respective cells.

Beyond this eye-witness testimony, physical evidence connected Brisbon to the murder. Witness Tyreed Green testified that five days before the stabbing, he observed Binford steal a metal spoon from a serving cart. Later that same day, Green observed Brisbon sharpening a spoon on the prison's concrete floor while Binford stood cover in front of his cell.

After the killing, prison investigators recovered a homemade knife underneath a nearby stairway. It was 6-7 inches long with a cardboard handle taped to the blade. Bloodstains on the knife matched the victim's blood. Investigators also discovered two fingerprints underneath the knife's cardboard handle that matched those of Brisbon. And the knife's paper sheath was made from a shoe catalog, which inmates had seen in Brisbon's possession.

An autopsy revealed five stab wounds, two of which were fatal. The two fatal wounds were to the victim's upper back. The autopsy further revealed that the two fatal wounds, and all but one of the other punctures, were made by a sharp instrument, 6-7 inches in length.

In addition to the above testimony and physical evidence, Brisbon has submitted the following facts, which he has gathered to support his *habeas* petition. Brisbon claims that after the murder, prison officials put the facility on "lockdown" and launched an immediate investigation, but found no information regarding the killers' identities. The administrators continued the lockdown for three months and applied additional pressure on influential inmates to persuade witnesses to come forward against Brisbon. Eventually, in January 1979, several inmates reversed their original statements and named Brisbon as one of the killers. Amongst these inmates were eye-witnesses Baynes, Green, and Ward. Brisbon has collected prison records revealing that these witnesses received transfers, "good-time" credit, and other benefits in exchange for their cooperation. Brisbon further claims that these witnesses were not the only inmates with information regarding the murder. Rather, Brisbon alleges that other inmates, including James Foster, Herman Morgan, Charles Whitson, and Donald Binford, could have testified that Brisbon was not the killer, but were not interviewed by Brisbon's defense counsel.

## II. STANDARD OF REVIEW

Brisbon filed his petition prior to the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and this case is therefore governed by the law that was in force prior to the statutory amendments. *Lindh v. Murphy*, 521 U.S. 320 (1997). Before AEDPA, federal courts disregarded the state court's legal conclusions and reached independent judgments on the issues presented to them, but deferred to the state court's findings of fact. *Agnew v. Leibach*, 250 F.3d 1123, 1128 (7th Cir. 2001).

4

But before a federal court will consider a *habeas corpus* petition, a petitioner must satisfy several procedural requirements. First, a petitioner must exhaust state remedies – that is, the petitioner must give the state's highest court an opportunity to address each claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999). To satisfy this requirement, a petitioner must fairly present to the state judiciary both the operative facts and legal principles that control each claim. *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001). A federal court, however, may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## III. PROCEDURALLY DEFAULTED CLAIMS

### A. Ineffective Assistance of Trial Counsel

Brisbon first claims that his trial counsel was ineffective because he did not (1) move for a severance; (2) properly use exculpatory evidence; (3) present a defense; (4) establish the perjury of the State's witnesses; or (5) conduct an adequate investigation. Brisbon raised variants of the these claims in his post-conviction petition to the Will County Circuit Court, but then abandoned them on appeal to the Illinois Supreme Court. This deprived the highest state court of an opportunity to act on his claims, thereby procedurally defaulting them. *Boerckel*, 526 U.S. at 845; *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) (failure to pursue a discretionary post-conviction appeal to the highest court of the state constitutes a procedural default that bars resort to federal *habeas corpus* relief).

As "cause" to excuse his default, Brisbon argues that he did not raise the claims sooner because the State prevented him from discovering the facts underlying his claim. But other than a passing reference to *Brady v. Maryland*, 373 U.S. 83 (1963), Brisbon does not support this position with legal

5

argument, factual allegations, or citations to relevant authority. This is not surprising because, in this context, Brisbon's assertion of "cause" makes little sense. His trial counsel's performance is a matter of record. If, for example, Brisbon believed that trial counsel was ineffective for not requesting a severance, he could have (and should have) raised the issue in state court. This same goes for Brisbon's complaints regarding his counsel's failure to impeach State witnesses, present a defense, investigate his case, or properly use exculpatory evidence. The court can only conclude that Brisbon's failure to raise his ineffectiveness claims in state court was not the result of the State's misconduct, but rather the conscious choice of his appellate and post-conviction counsel to abandon these claims. As Brisbon has not articulated a position to convince the court otherwise, he has failed to establish "cause" to overcome procedural default.

But Brisbon argues that he does not have to demonstrate "cause," because he is actually innocent of the murder. Through this argument, Brisbon invokes the "miscarriage of justice exception" to excuse his procedural default. This exception applies to the "extremely rare" and "extraordinary case" where a petitioner is *actually innocent* of the crime for which he is imprisoned. *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (emphasis added); *see also Calderon v. Thompson*, 523 U.S. 538, 559 (1998) ("Given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected."). To prove actual innocence the petitioner must come forward with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. The petitioner must also establish that "it was more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327. Brisbon has not met this stringent standard.

The cornerstone of Brisbon's actual innocence claim is a statement by Brisbon's accomplice, Donald Binford, apparently made to prison officials in 1983 five years after the murder. The statement remained filed away in the Will County State's Attorney's Office until it was recently produced pursuant to this court's discovery order. In this statement, Binford claims that he, and he alone, killed Richard Morgan after they got into an argument about a debt that Morgan owed him. Binford also claims that Brisbon was playing cards outside his own cell during the altercation and had nothing to do with the murder. Brisbon argues that this confession proves his actual innocence.

Brisbon makes too much of this new evidence. Binford's statement is unsigned and thus raises immediate skepticism regarding its authenticity. Also, Binford's statement is inconsistent with an affidavit, which he made in 1990 to support Brisbon's post-conviction appeal. In this affidavit, Binford claims that Brisbon was *locked* in his cell during the murder. This testimony conflicts with his earlier statement, in which Binford claims that Brisbon was playing cards *outside* of his cell during the murder. This inconsistency casts further doubt on the veracity of Binford's confession. Perhaps most important, however, is that Binford's statement sharply conflicts with the evidence presented at Brisbon's trial. For instance, Binford claims that he was the only inmate who participated in the murder. This directly contradicts the eye-witness testimony of three inmates, that Brisbon was also involved in the attack. Moreover, Binford's version of the events completely disregards and contradicts prison guard Mercer's testimony that Brisbon forced him to open his cell at knife-point. Lastly, Binford's statement fails to explain the substantial physical evidence linking Brisbon to the murder. As the content of Binford's statement is wholly contradicted by trial testimony from multiple witnesses, it does not rise to the level of reliable evidence required under the miscarriage of justice exception. Brisbon cannot establish that no reasonable juror would have convicted him based solely on Binford's statement.

7

Brisbon also submits a number of inmate affidavits to prove his innocence. Among these are the affidavits of two inmates, Josie Baynes and Luke Ward, who testified as eye-witnesses to the murder. More than ten years after the murder, Baynes and Ward made sworn statements recanting their prior trial testimony implicating Brisbon. Baynes, in a two-page, skeletal affidavit, claims that he did not actually see Brisbon stab Hippie Morgan despite his trial testimony to the contrary. Ward's affidavit similarly states that he lied about witnessing Brisbon kill Hippie Morgan. Affidavits like these are not uncommon and experience has shown that they are to be treated with a fair degree of skepticism. *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (Justice O'Connor, concurring); *see also United States v. Kamel*, 965 F.2d 484, 494 (7th Cir. 1992) ("Recanting affidavits and witnesses are viewed with extreme suspicion."). Also, to be of any probative value, the court must be reasonably certain that the recantation is true. *United States v. Leibowitz*, 919 F.2d 482, 484 (7th Cir. 1990). Here, the affidavits must be considered in light of the proof of Brisbon's guilt at trial – proof which includes uncontroverted eyewitness identifications, substantial physical evidence linking Brisbon to the crime, and numerous other pieces of circumstantial evidence. That proof, even when considered alongside the belated affidavits, points strongly to Brisbon's guilt. Thus, the recantations carry little weight, and do not prove Brisbon's actual innocence.

Finally, Brisbon offers the affidavits of three inmates, Charles Whitson, Herman Morgan, and James Foster, who did not testify at his trial, but claim that Brisbon did not kill Hippie Morgan. These affidavits are short, bereft of detail, and wholly inconsistent with trial testimony. Also, the language used in some of the affidavits mirrors the language in other affidavits, indicating that the inmates may have been coached into preparing their statements. And the affidavits were drafted twelve to twenty years after the murder, which raises serious questions as to their reliability.

In sum, Brisbon's new evidence falls way short of the "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" required to demonstrate actual innocence. *Schlup*, 513 U.S. at 324. Thus, the miscarriage of justice exception cannot revive his defaulted claims.

B. *Brady* Violation

Brisbon next argues that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Brisbon claim that the State failed to disclose (1) the Binford confession; (2) a one page, handwritten letter from inmate Luke Ward expressing displeasure with his housing situation; and (3) the full extent of the benefits offered to inmate witnesses to secure their cooperation against Brisbon.

Brisbon did not bring this claim on direct appeal. Nor did Brisbon raise the claim on post-conviction review. These omissions deprived the state courts of an opportunity to act on his *Brady* claims, thereby procedurally defaulting them. *Boerckel*, 526 U.S. at 845; *White*, 192 F.3d at 608. But Brisbon argues that he can demonstrate "cause" to excuse his default. Brisbon maintains that he did not raise his *Brady* claims in state court because he did not discover the evidence underlying the claims until after he filed his *habeas* petition. And he faults the State for withholding this favorable evidence, rather than his own lack of diligence.

The failure of counsel to raise a constitutional issue reasonably unknown to him, is one situation in which the cause requirement is met. *Reed v. Ross*, 468 U.S. 1, 14 (1984). Generally, this requires that some objective factor external to the defense impeded counsel's compliance with the state's procedural rules. *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999). In the context of a defaulted *Brady* claim, the petitioner must show that the prosecution's withholding of favorable evidence prevented him from

9

discovering the facts underlying his constitutional claim. *Crivens v. Roth*, 172 F.3d 991, 995-96 (7th Cir. 1999). Here, it appears that Brisbon is arguing that he would have raised his *Brady* claims sooner, but did not realize he had them, until he discovered that the State had withheld Binford's confession, Ward's letter, and details regarding the deals offered State witnesses. The record confirms that the State did not disclose this potentially favorable information until after Brisbon filed his *habeas* petition, and Brisbon should not be penalized for the State's withholding. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'some interference by officials' . . . made compliance impracticable, would constitute cause under this standard." (citations omitted)).

Brisbon also must demonstrate the he was prejudiced by the State's failure to share the referenced information. Brisbon has not addressed this requirement in any meaningful way. Thus, he has not met the standards required to overcome a procedural default. But even assuming that Brisbon could show prejudice, his *Brady* claims are ultimately without merit.

To prove a *Brady* violation, Brisbon must establish that (1) the State withheld evidence that (2) was favorable and (3) material to the defense. *Brady*, 373 U.S. at 87. None of the allegedly suppressed information meets these requirements. Ward's letter is a one-page, handwritten document composed by an inmate complaining about his delayed housing transfer. The letter is not exculpatory evidence, as it mentions nothing about Brisbon or the murder. Nor is the letter impeachment evidence, as it does not contradict, recant, or expand upon Ward's trial testimony. Thus, Ward's letter does not constitute "favorable" evidence as described by *Brady* and its progeny. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (favorable evidence under *Brady* includes both exculpatory and impeachment evidence). Morever, the letter is undated, and it appears to have been drafted well after Brisbon's trial. This court does not

10

understand how this document could have benefitted Brisbon's defense. Because Ward's letter does not exhibit any of the characteristics that would trigger the prosecution's duty to disclose, the State's failure to share the document with the defense cannot establish a *Brady* violation.

This conclusion also holds for Brisbon's second category of information allegedly withheld from the defense – details regarding benefits offered trial witnesses. First of all, Brisbon has not demonstrated that the State actually "suppressed" such evidence. For *Brady* purposes, evidence is suppressed if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence; and (2) the evidence was not otherwise available through the exercise of reasonable diligence. *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003). The record reveals that Brisbon had the opportunity to vigorously cross-examine the State's witnesses regarding potential bias, and did, in fact, reveal information regarding benefits offered the State's witnesses. While it is true that the State's post-trial disclosures exposed more *specific* details regarding these benefits, Brisbon has not explained why the same information was not available to him through further, more pointed cross-examination. But even assuming that Brisbon could show that the State suppressed such information, Brisbon cannot show that the undisclosed evidence was material to the defense. Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Moore v. Casperson*, 345 F.3d 474, 493 (7th Cir. 2004). The documents allegedly withheld are nothing more than internal prison records detailing the housing transfers arranged for testifying witnesses. Brisbon makes no argument why the absence of these documents somehow casts doubt upon the verdict or impaired his ability to receive a fair trial. Thus, the withholding of this second category of information similarly fails to establish a *Brady* violation.

11

Brisbon's final piece of evidence is the previously discussed statement of Brisbon's accomplice, Donald Binford, in which Binford takes sole responsibility for the murder. The record confirms that the State suppressed Binford's confession. But the State's withholding of this information did not result in a *Brady* violation, because Binford's statement is neither favorable nor material to the defense. At first glance, the confession certainly appears exculpatory, but a closer inspection reveals serious concerns regarding its authenticity. Binford's statement is inconsistent with an affidavit Binford filed in support of Brisbon's petition for post-conviction relief. The statement also fails to corroborate, and sharply conflicts with, the substantial and uncontroverted evidence of Brisbon's guilt presented at trial. Nothing about Binford's statement persuades this court that it represents a reliable, authentic piece of exculpatory evidence. But even if the statement constituted favorable evidence, Binford's statement was not material to the defense.

Binford made his confession years after Brisbon's trial had concluded. At best, Brisbon could have used the statement to move for a new trial on the grounds of newly discovered evidence. In Illinois, the standard for a new trial based on newly discovered evidence requires that the new evidence be of "such conclusive character that it will probably change the result on retrial." *People v. Molstad*, 101 Ill.2d 128, 134 (1984). Binford's unsigned and uncorroborated confession can hardly be deemed so conclusive that it would have changed the result on retrial. Rather, the record provides strong support for the conclusion that Brisbon's conviction would have withstood a challenge based on this new evidence. For these reasons, Brisbon's *Brady* claims are without merit.

C. Prosecutorial Misconduct

Brisbon raises a number of claims relating to the State's alleged misconduct. Brisbon first argues that the State knowingly used perjured testimony at trial. Brisbon also contends that the State frustrated

12

his trial counsel's investigation by transferring potential defense witnesses to remote and undisclosed facilities before trial. Lastly, Brisbon argues that prison officials and investigators threatened witnesses into giving false testimony against Brisbon, and that this behavior violated his due process rights. These claims are all procedurally defaulted.

Brisbon did not bring these claims on direct appeal or on post-conviction review. These omissions deprived the state courts of an opportunity to act on his prosecutorial misconduct claims, thereby procedurally defaulting them. *Boerckel*, 526 U.S. at 845; *White*, 192 F.3d at 608. Brisbon again maintains that he can demonstrate "cause" to excuse his procedural default. But other than a passing reference to *Brady v. Maryland*, 373 U.S. 83 (1963), Brisbon makes no attempt to develop his assertion of "cause." And it is not clear from the record how the State's withholding of evidence in violation of *Brady* would serve as "cause" to excuse Brisbon's default. Therefore, Brisbon has not demonstrated cause to overcome his procedural default.

Brisbon also claims that the miscarriage of justice exception rescues his defaulted claims. But, as discussed earlier, this argument is without merit because Brisbon has not produced reliable evidence of his actual innocence to satisfy the exception's exacting standards. Thus, as Brisbon cannot overcome his procedural default, the court is barred from collaterally reviewing his prosecutorial misconduct claims. *Coleman*, 501 U.S. at 750.

D. Cumulative Effects

Brisbon contends that the cumulative effect of the trial court's errors resulted in a constitutional violation. Brisbon never raised a cumulative error claim in the Illinois courts, thereby procedurally defaulting the claim. *Boerckel*, 526 U.S. at 845; *White*, 192 F.3d at 608. Because Brisbon offers no

13

explanation to excuse his procedural default, this court cannot consider his claim on collateral review. *Coleman*, 501 U.S. at 750.

## IV. OTHER HABEAS CLAIMS

### A. Failure to Sequester Jury

Brisbon contends that the trial court violated his rights to due process and a fair trial when the court refused to sequester the jury. His contention is that, because of his previous murder convictions, this trial generated a great deal of pre-trial publicity, and the refusal to sequester the jury adversely affected his chances of receiving a fair trial.

In this case, upon Brisbon's pre-trial motion, the jurors were questioned regarding their exposure to any media reports about the current case or about Brisbon's criminal history. All of the jurors, along with the three alternates, answered that they had not been exposed to anything about the case or about Brisbon. The trial court then denied Brisbon's motion to sequester the jury. The court opened the trial proceedings by providing a detailed admonishment to the jury, advising jurors not to watch news programs, not to discuss the case and not to read or listen to anything about the case. This admonishment was repeated several times throughout the trial. Based on the record, this court finds that the trial court did not abuse its discretion by denying Brisbon's motion to sequester the jury.

Sequestration is an extreme measure, one of the most burdensome tools of the many available to assure a fair trial. *Drake v. Clark*, 14 F.3d 351, 358 (7th Cir. 1994). The decision of whether to grant a request for jury sequestration lies within the discretion of the trial court, and that decision will not be disturbed absent an abuse of discretion. *United States v. Kimberlin*, 805 F.2d 210, 224 (7th Cir. 1986). When determining whether a trial judge has abused that discretion, reviewing courts consider the quality and quantity of admonishments given to the jurors regarding their duty to avoid media reports about the

case and its parties. Here, the trial court explicitly and repeatedly instructed jurors not to read anything, watch anything, or listen to anything on the radio concerning the case. This was sufficient. *See id.* (no abuse of discretion in denying defense motion to sequester jury, when trial judge warned jury at every recess not to talk about the case, read newspaper reports about it or listen to television or radio reports about it).

In addition, Brisbon has not shown actual prejudice arising from the court's refusal to sequester the jury. *See United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11th Cir. 1992) ("only a showing of actual prejudice will demonstrate that the lower court abused its discretion by failing to sequester the jury."). Brisbon's request for relief is therefore denied.

B.  Discriminatory Use of Peremptory Challenges

Brisbon alleges that the State improperly excluded black women from the convicting jury. The record shows that the jury seated in Brisbon's trial consisted only of men, and that the State used fifteen of their twenty-one peremptory challenges to strike women from the venire. Of these fifteen, eight were used to eliminate black women from the pool.

Before addressing the merits of Brisbon's challenge, the court must determine what law applies. Brisbon argues for the court to use the standards set forth in the United States Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), while the State maintains that the Supreme Court's earlier decision in *Swain v. Alabama*, 380 U.S. 202 (1965) controls.

The answer to this question is important because *Batson* established a new constitutional rule regarding the use of peremptory challenges to eliminate potential jurors from the venire. In *Griffith v. Kentucky*, the Supreme Court held that *Batson* applies retroactively to all cases pending on direct review or not yet final at the time the decision was rendered. *Griffith v. Kentucky*, 479 U.S. 313, 328 (1987).

15

The Supreme Court defined "final" as "a case in which judgment of conviction has been rendered, the availability of appeal exhausted . . . or a petition for certiorari finally denied." *Id.* at 321 n.6.

*Batson* was decided on April 30, 1986. By that time, Brisbon's conviction had been upheld by the Illinois Supreme Court, *Brisbon I*, 106 Ill.2d 342 (1985), and the United States Supreme Court had denied his request for certiorari. *Brisbon v. Illinois*, 474 U.S. 908 (1985). Thus, under *Griffith*, Brisbon's claim was final when the Supreme Court decided *Baston*. Therefore, *Baston* does not apply here.

It should be noted that, on direct appeal, the Illinois Supreme Court vacated Brisbon's sentence for rehearing, the resentencing took place after *Baston* was issued. But this later activity does not modify the conclusion that Brisbon's conviction was final for purposes of *Griffith* retroactivity. All issues relating the Brisbon's guilt or innocence, including the jury selection question, had been finally resolved before *Batson* was released. And the Illinois Supreme Court's decision to vacate Brisbon's sentence had no bearing of the finality of his conviction. *See Holman v. Gilmore*, 126 F.3d 876, 880 (7th Cir. 1997); *see also Lyles v. Page*, 1997 WL 428505, *5 (N.D.Ill. 1997(even if resentencing is pending, conviction still considered final for purposes of *Griffith* retroactivity).

Prior to *Batson*, *Swain v. Alabama* governed claims alleging discriminatory use of peremptory challenges against potential jurors. *Swain*, 380 U.S. at 202. Under *Swain*, the petitioner is required to demonstrate that the prosecution used its peremptory challenges to systematically exclude the same racial group in "case after case." *Id.* at 223. Brisbon offers no evidence to demonstrate such a pattern. Without such evidence, his claim cannot stand.

C. Confrontation Clause Violation

Brisbon claims that the trial court impermissibly restricted his ability to cross-examine Tyreed Green, a State witness, in violation of his Sixth Amendment right to confrontation. Specifically, he contends that the court improperly denied him the right to question Green about specific details regarding

16

a 1969 attempted murder conviction. Brisbon's contention is that this limitation prevented the jury from seeing the "ugly past of Tyreed Green."

The right to cross-examine witnesses is not unlimited. *See Delaware v. Fensterer*, 474 U.S. 15. 20 (1985) (Confrontation Clause does not guarantee the right to "cross-examination that is effective in whatever way, and to whatever extent, the defense may wish."). The trial court has discretion to impose reasonable limits upon the scope of cross-examination for a variety of reasons, including "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Contrary to Brisbon's assertion, the jury was exposed to many sordid details of Green's past. The trial court permitted Brisbon's counsel to question Green about several prior convictions, multiple parole denials, and his transfer out of Stateville in exchange for cooperating with the State. The jury had sufficient information to evaluate Green's motive and bias. *See Quinn v. Neal*, 998 F.2d 526, 529 (7th Cir. 1993) (the effectiveness of a cross-examination turns on whether the jury had sufficient information to make a discriminating appraisal of a witness' motive and bias). Thus, because Brisbon was allowed to thoroughly question Green about his criminal history and other potential sources of bias, the trial court did not abuse its wide discretion in restricting Brisbon's ability to elicit certain details regarding Green's attempted murder conviction. *See United States v. Dillard*, 43 F.3d 299, 305 (7th Cir. 1994) (finding no error when petitioner thoroughly questioned witness about criminal history). Thus, this final request for relief is also denied.

## V. REQUEST FOR EVIDENTIARY HEARING

Brisbon requests an evidentiary hearing to further develop his *habeas* claims. A district court may employ a variety of measures to avoid the need for an evidentiary hearing on disputed facts. *Blackledge*

17

*v. Allison*, 431 U.S. 63, 81 (1977). Most importantly, an evidentiary hearing is not necessary when the facts essential to consideration of the constitutional issues are already before the court. *Jeter v. Keohane*, 739 F.2d 257, 257 n.1 (7th Cir. 1984).

The court allowed Brisbon to seek extensive discovery of prison and inmate records. In addition, Brisbon's *habeas* attorneys supplemented the record with numerous documents, including affidavits and letters from inmates and other witnesses. The court has spend a great deal of time reviewing this "new" evidence in conjunction with its consideration of Brisbon's *habeas* claims. The court finds that the facts needed for resolution of Brisbon's claims are already before the court, and that an evidentiary hearing would not offer significant additional guidance. Thus, an evidentiary hearing is not necessary, and Brisbon's request is denied.

## VIII. CONCLUSION

For the reasons stated above, the court denies Brisbon's petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. This case is terminated and any pending motions are denied as moot. The court wishes to express its appreciation to petitioner's counsel for their commendable efforts on behalf of Mr. Brisbon, and to all counsel for presenting this challenging case in a highly professional, thorough manner.

Date: 6/4/04

ENTERED:

WILLIAM J. HIBBLER
United States District Court Judge

18